**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE US TIGER SECURITIES INC. DATA BREACH LITIGATION | Case No.: 1:26-cv-04223-JPO<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Christopher Tillberry, Taylor Shill and Yu Lan ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Consolidated Class Action Complaint against US Tiger Securities Inc. ("US Tiger" or "Defendant"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## INTRODUCTION

1. Plaintiffs bring this class action lawsuit individually and on behalf of all persons who entrusted Defendant with sensitive personally identifiable information ("PII" or "Private Information") who were impacted in a data breach (the "Data Breach" or the "Breach").

2. Plaintiffs' claims arise from Defendant's failure to properly secure and safeguard Private Information that was entrusted to it, and its accompanying responsibility to store and transfer that information.

3. Defendant is a financial technology brokerage firm that provides trading and investment services. Defendant operates in affiliation with TradeUp Securities, Inc. and supports brokerage operations through shared back-office systems. Defendant is headquartered in New

York, New York.[1]

4. Defendant had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on its affirmative representations to Plaintiffs and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

5. On or about July 10, 2025, Defendant discovered that it was the target of a cybersecurity incident.[2] In response, Defendant initiated an investigation and retained cybersecurity professionals to determine the nature and scope of the incident.[3]

6. The investigation determined that files were copied by an unauthorized third party from Defendant's virtual environment between July 8, 2025, and July 9, 2025. [4]

7. Upon information and belief, names, Social Security numbers, and other government ID numbers were compromised in the Data Breach.[5]

8. On May 15, 2026, Defendant began notifying impacted individuals by U.S. mail about the Data Breach. Upon information and belief, approximately 26,985 individuals from Defendant's virtual environment systems, including Plaintiffs, were impacted.

9. Defendant failed to take precautions designed to keep individuals' Private Information secure.

10. Defendant owed Plaintiffs and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized

---

[1] *About us*, US TIGER SECURITIES INC., https://www.itigerup.com/en (last visited June 8, 2026).
[2] *Exhibit 1*: Christopher Tillberry's Notice letter, Taylor Shill's Notice letter, and Yu Lan's Notice letter ("Notice Letters").
[3] *Id*.
[4] *Id*.
[5] *Exhibit 1*: Notice Letters*; see also Security Breach Notices: US Tiger Securities, Inc.,* OFFICE OF THE VERMONT ATTORNEY GENERAL, https://ago.vermont.gov/categories/security-breach-notices (last visited June 8, 2026).

access. Defendant solicited, collected, used, and derived a benefit from the Private Information, yet breached its duty by failing to implement or maintain adequate security practices.

11. Defendant admits that information in its system was accessed by unauthorized individuals, though it provided little information regarding how the Data Breach occurred.

12. The sensitive nature of the data exposed through the Data Breach signifies that Plaintiffs and Class Members have suffered irreparable harm. Plaintiffs and Class Members have lost the ability to control their Private Information and are subject to an increased risk of identity theft.

13. Defendant, despite having the financial wherewithal and personnel necessary to prevent the Data Breach, nevertheless failed to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it maintained for Plaintiffs and Class Members, causing the exposure of Plaintiffs' and Class Members' Private Information.

14. As a result of Defendant's inadequate digital security and notice process, Plaintiffs' and Class Members' Private Information was exposed to criminals. Plaintiffs and Class Members have suffered and will continue to suffer injuries, including: financial losses caused by misuse of their Private Information; the loss or diminished value of their Private Information as a result of the Data Breach; lost time associated with detecting and preventing identity theft; and theft of personal and financial information.

15. Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; (iii) effectively secure hardware containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and

incidents; and (iv) timely notify Plaintiffs and Class Members of the Data Breach.

16. Plaintiffs bring this action individually and on behalf of a Class of similarly situated individuals against Defendant for: negligence; unjust enrichment; breach of implied contract; and breach of confidence.

17. Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose Private Information was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES

***Plaintiffs***

18. Plaintiff Christopher Tillberry is a natural person and citizen of Indianapolis, Indiana, where he intends to remain.

19. Plaintiff Taylor Shill is a natural person and citizen of Blaine, Minnesota, where he intends to remain.

20. Plaintiff Yu Lan is a natural person and citizen of King County, Washington, where he intends to remain.

***Defendant***

21. Defendant is a financial technology brokerage firm that provides trading and investment services. Defendant operates in affiliation with TradeUp Securities, Inc. and supports brokerage operations through shared back-office systems. Defendant is headquartered in New York, New York, having its principal place of business located at 437 Madison Avenue, Floor 27,

New York, New York 10022.[6]

## JURISDICTION AND VENUE

22. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

23. This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintains its principal place of business in this District.

24. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendant

25. Defendant is a financial technology brokerage firm that provides trading and investment services. Defendant operates in affiliation with TradeUp Securities, Inc. and supports brokerage operations through shared back-office systems. Defendant is headquartered in New York, New York.[7]

26. To receive services from Defendant, Plaintiffs and Class Members were required to provide their Private Information to Defendant which Defendant collected, stored, and maintained in its systems and network. Upon information and belief, Defendant made promises

---

[6] *Contact Us*, US TIGER SECURITIES, INC., https://www.itigerup.com/en/about/contactus (last visited June 8, 2026).

[7] *About us*, US TIGER SECURITIES, INC., https://www.itigerup.com/en (last visited June 8, 2026).

and representations to individuals, including Plaintiffs and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.[8]

27. Defendant was aware of its duty to protect the Private Information of Plaintiffs and the Class, stating its Privacy Policy that:

> We have taken reasonable and practical security measures in line with industry standards to protect your personal information against unauthorized access, public disclosure, use, modification, destruction or loss of data. We will take all reasonable and feasible measures to protect your personal information.

28. Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

29. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

30. As a result of collecting and storing the Private Information of Plaintiffs and Class Members for its own financial benefit, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiffs' and the Class Members' Private Information from disclosure to third parties.

**B. The Data Breach**

31. On or about July 10, 2025, Defendant discovered a cybersecurity incident affecting

---

[8] *Privacy Policy,* US TIGER SECURITIES, INC., https://www.itigerup.com/en/agreement/ALL-PrivacyPolicy-TB?skin=2 (last visited June 8, 2026).

its virtual back-office environment.[9] In response, Defendant initiated an investigation and retained cybersecurity professionals to determine the nature and scope of the incident.

32. The investigation determined that files were copied by an unauthorized third party from Defendant's virtual environment between July 8, 2025, and July 9, 2025.

33. Upon information and belief, names, Social Security numbers, and other government ID numbers were compromised in the Data Breach.[10]

34. Upon information and belief, the unauthorized third party copied files containing the Private Information of approximately 26,985 individuals from Defendant's virtual environment systems.

35. On May 15, 2026, Defendant began notifying impacted individuals.

36. Plaintiffs' and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Defendant's deficient security for client data caused and allowed criminals to target and take files containing Plaintiffs' and Class Members' inadequately protected Private Information in Defendant's possession through the Data Breach.

37. Because Defendant had a duty to protect Plaintiffs' and Class Members' Private Information, Defendant should have known through readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information. Thus, Defendant had a duty to ensure that the Private Information stored within its networks and systems was secured and protected against unauthorized disclosure to third parties.

38. Defendant failed to take precautions designed to keep individuals' Private Information secure.

---

[9] *Exhibit 1*: Notice Letters.
[10] *Id.; see also Security Breach Notices: US Tiger Securities, Inc.,* OFFICE OF THE VERMONT ATTORNEY GENERAL, https://ago.vermont.gov/categories/security-breach-notices (last visited June 8, 2026).

39. While Defendant sought to minimize the damage caused by the Data Breach, it cannot and has not denied that there was unauthorized access to the sensitive Private Information of Plaintiffs and Class Members.

40. Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

**C. Defendant's Failure to Prevent, Identify, and Timely Report the Data Breach**

41. Defendant admits that an unauthorized third party accessed its employees' data. Defendant failed to take adequate measures to protect its computer systems against unauthorized access.

42. The Private Information that Defendant allowed to be exposed in the Data Breach is the type of private information that Defendant knew or should have known would be the target of cyberattacks.

43. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[11] Defendant failed to disclose that its systems and security practices were inadequate to reasonably safeguard individuals' Private Information.

44. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[12] Immediate notification of a data breach is critical so that those impacted can take measures to protect themselves.

---

[11] *Protecting Personal Information: A Guide for Business,* FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited June 8, 2026).

[12] *Id.*

45. Here, Defendant waited approximately ten months after being made aware of the Data Breach to notify impacted individuals.

46. Plaintiffs and Class Members could have enrolled in credit monitoring, instituted credit freezes, and changed their passwords, among other things, had they been alerted to the Data Breach more quickly.

47. Plaintiffs and Class Members suffered harm from Defendant's delay in notifying them of the Data Breach.

**D. Data Breaches Are Preventable**

48. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as deleting the information when it is no longer needed.

49. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

50. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[13]

51. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is

[13] *How to Protect Your Networks from RANSOMWARE*, FBI, at 3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited June 8, 2026).

delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[14]

[14] *Id.* at 3-4.

52. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**
- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[15]

53. Given that Defendants were storing the Private Information of their current and former students and employees, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks. However, Defendants failed to do so.

54. The occurrence of the Data Breach indicates that Defendant failed to adequately

[15] *See Human-operated ransomware attacks: A preventable disaster,* MICROSOFT (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited June 8, 2026).

implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, tens of thousands of individuals, including that of Plaintiffs and Class Members.

### E. Defendant Acquires, Collects, and Stores the Private Information of Plaintiffs and the Class

55. Defendant acquires, collects, and stores a massive amount of Private Information on its current and former clients.

56. As a condition of obtaining services from Defendant, Defendant requires that clients entrust it with highly sensitive personal information.

57. By obtaining, collecting, and using Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

58. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a promise to safeguard that information.

59. Upon information and belief, in the course of collecting Private Information from clients, including Plaintiffs, Defendant promised to provide confidentiality and adequate security for their data through their applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

60. Plaintiffs and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**F. Defendant Knew or Should Have Known of the Risk Because Financial Institutions in Possession of Private Information Are Particularly Susceptible to Cyber Attacks**

61. Defendant's data security obligations were particularly important given the substantial increase in cyber attacks and/or data breaches targeting financial institutions that collect and store Private Information, like Defendant, preceding the date of the Breach.

62. Data breaches, including those perpetrated against financial institutions that store Private Information in their systems, have become widespread.

63. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare adjacent industries. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

64. In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

65. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware

criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[16]

66. Additionally, as companies became more dependent on computer systems to run their business,[17] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[18]

67. Defendant knew and understood that unprotected or exposed Private Information in the custody of financial institutions, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

68. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendant's data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

69. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will

---

[16] Ben Kochman, *FBI, Secret Service Warn Of Targeted Ransomware*, LAW360 (Nov. 18, 2019) https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last visited June 8, 2026)

[17] Danny Brando, et al., *Implications of Cyber Risk for Financial Stability*, FEDERAL RESERVE (May 12, 2022) https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited June 8, 2026)

[18] Dr. Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS SECURITY (March 24, 2022) https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited June 29, 2026).

continue to incur such damages in addition to any fraudulent use of their Private Information.

70. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

71. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

72. As a financial institution in custody of the Private Information of its clients, Defendant knew, or should have known, the importance of safeguarding Private Information entrusted to it by Plaintiffs and Class Members, and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

## G. Value of Private Information

73. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[19] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official state or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[20]

[19] 17 C.F.R. § 248.201 (2013).
[20] *Id.*

74. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[21]

75. For example, personal information can be sold at a price ranging from $40 to $200.[22] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[23]

76. Of course, a stolen Social Security number – which, upon information and belief, were compromised for Class Members in the Data Breach – can be used to wreak untold havoc upon a victim's personal and financial life. The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

77. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

---

[21] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019) https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited July 1, 2026).
[22] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, EXPERIAN (June 30, 2025) https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited July 1, 2026).
[23] *In the Dark*, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited July 1, 2026).

78. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[24] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[25]

79. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by some Plaintiffs and Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[26]

80. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[27] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[28]

---

[24] *See Avoid Identity Theft: Protect Social Security Numbers*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases (last visited June 8, 2026).

[25] *Id.*

[26] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed May 18, 2026)

[27] *See How to Protect Yourself from Social Security Number Identity Theft,* EQUIFAX, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited June 8, 2026).

[28] *See* Julia Kagan, *Understanding Social Security Numbers (SSN): Key Facts & Purposes*, INVESTOPEDIA (Oct. 11, 2025) https://www.investopedia.com/terms/s/ssn.asp (last visited June 8, 2026).

81. What's more, it's not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

82. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[29]

83. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social

[29] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015) https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 8, 2026)

security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.")

84. Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[30]

85. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

86. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[31]

87. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police. Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the

---

[30] *See Your Social Security Number: Controlling the Key to Identity Theft*, STATE OF CALIFORNIA DEPARTMENT OF JUSTICE: OFFICE OF THE ATTORNEY GENERAL, https://oag.ca.gov/idtheft/facts/your-ssn (last visited June 8, 2026)

[31] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015) https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited June 8, 2026).

thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[32]

88. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

89. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**H. Defendant Fails to Comply with FTC Guidelines**

90. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

91. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer

---

[32] *Medical I.D. Theft*, EFRAUDPREVENTION, https://efraudprevention.net/home/education/?a=187 (last visited June 8, 2026).
[33] *PERSONAL INFORMATION: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, at 29 (June 2007) https://www.gao.gov/assets/gao-07-737.pdf (last visited June 8, 2026).

networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[34]

92. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[35]

93. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network and verify that third-party service providers have implemented reasonable security measures.

94. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

95. These FTC enforcement actions include actions against financial institutions, like Defendant.

96. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or

[34] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed June 8, 2026)
[35] *Id.*

affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

97. Defendant failed to properly implement basic data security practices.

98. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the Private Information of their current and former clients or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C § 45.

99. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its current and former clients. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

**I. Defendant Failed to Comply with Industry Standards.**

100. As noted above, experts studying cybersecurity routinely identify financial institutions in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information they collect and maintain.

101. Several best practices have been identified that, at a minimum, should be implemented by financial institutions in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable

without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

102. Other best cybersecurity practices that are standard for financial institutions include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

103. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

104. These foregoing frameworks are existing and applicable industry standards for financial institutions, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**J. Data Breaches Increase Victims' Risk of Identity Theft**

105. The unencrypted Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers who access network systems from companies, like Defendant, to obtain confidential personal information and exploit it for monetary gain.

106. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

107. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft-related crimes discussed below.

108. Plaintiffs' and Class Members' Private Information is of greater value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members to profit off their misfortune.

109. Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security system, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[36]

110. Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into

---

[36] *See* N.C. Gen. Stat. § 132-1.10(1).

their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[37]

111. "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[38] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account."[39]

112. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[40]

113. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to complete dossiers on individuals.

---

[37] *See* Husayn Kassai, *BankThink: Banks need to stop relying on Social Security numbers*, AMERICAN BANKER (updated Nov. 13, 2018) https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers (last visited June 8, 2026).

[38] *See* Ann Carrns, *Just 5 Banks Prohibit Use of Social Security Numbers,* THE NEW YORK TIMES (Mar. 20, 2013) https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/ (last visited June 8, 2026).

[39] *See* Nikkita Walker*, What Can Someone Do With Your Social Security Number?,* CREDIT.COM (Oct. 19, 2023) https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (last visited June 8, 2026)

[40] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited June 8, 2026)

114. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

115. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the Data Breach can easily be linked to the unregulated data (like contact information) of Plaintiffs and the other Class Members.

116. Thus, even if certain information (such as contact information) was not stolen in the Data Breach, criminals can still easily create a comprehensive "Fullz" package.

117. Then, this comprehensive dossier can be sold – and then resold in perpetuity – to crooked operators and other criminals (like illegal and scam telemarketers).

**K. Loss of Time to Mitigate Risk of Identity Theft and Fraud**

118. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

119. Thus, due to the actual and imminent risk of identity theft, Defendant, in its Notice

Letter, provides Plaintiffs and Class Members with "a complimentary 24-month subscription to Experian Identity Works . . . and additional information on steps you can take in response to this incident.[41]

120. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach. Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time – which cannot be recaptured – spent on mitigation activities.

121. Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[42]

122. Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[43]

123. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data

---

[41] *Exhibit 1*: Christopher Tillberry's Notice Letter.

[42] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited June 8, 2026).

[43] *See Steps,* FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps (last visited June 8, 2026).

breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

**L. Diminution of Value of Private Information**

124. Private Information is a valuable property right.[44] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

125. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[45]

126. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[46]

127. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[47,48]

128. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.

129. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information,

---

[44] *See See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited June 8, 2026).

[45] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[46] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/ (last visited June 8, 2026)

[47] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LOS ANGELES TIMES (Nov. 5, 2019) https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited June 8, 2026).

[48] *The personal data revolution*, DATACOUP, https://datacoup.com/ (last visited June 8, 2026).

which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional losses of value.

130. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

131. The fraudulent activity resulting from the Data Breach may not come to light for years.

132. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

133. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to, upon information and belief, tens of thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

134. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement and maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

**M. Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary**

135. Given the type of targeted attack in this case, sophisticated criminal activity, and the type of Private Information involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – *e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

136. Such fraud may go undetected until debt collection calls commence months, or even years later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

137. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

138. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

**N. Loss of Benefit of the Bargain**

139. Furthermore, Defendant's inadequate data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to Pay Defendant and/or its agents for financial services, Plaintiffs and other reasonable clients understood and expected that they were, in part, paying for the services and necessary data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected

to receive under the bargains they struck with Defendant.

### O. The Harm Caused by the Data Breach Now and Going Forward

140. Victims of data breaches are susceptible to becoming victims of identity theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9). When "identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[49]

141. The type of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft.

142. Plaintiffs and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

143. Stolen Private Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

144. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web, where malicious actors buy and sell that information for profit.[50]

145. For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings,

---

[49] *Prevention and Preparedness*, NEW YORK STATE POLICE, https://troopers.ny.gov/prevention-and-preparedness (last visited June 8, 2026).

[50] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited June 8, 2026).

many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[51] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[52]

146. PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[53] Criminals can also purchase access to entire company data breaches for $900 to $4,500.[54]

147. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[55]

148. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[56] Defendant did not rapidly report to Plaintiffs and Class Members that their Private Information had been stolen. Defendant did not notify impacted individuals for approximately ten months after learning of the Data Breach.

149. As a result of the Data Breach, the Private Information of Plaintiffs and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class

[51] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited June 8, 2026).
[52] *Id.*
[53] *Id.*
[54] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 8, 2026).
[55] *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion (last visited June 8, 2026).
[56] *Id.*

Members, or likely to be suffered as a direct result of Defendant's Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendant with the mutual understanding that Defendant would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further injurious breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

150. In addition to a remedy for economic harm, Plaintiffs and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

151. Defendant disregarded the rights of Plaintiffs and Class Members by (a) intentionally, wilfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions; (b) failing to disclose that it did not have adequately robust security protocols and training practices in place to safeguard Plaintiffs' and Class Members' Private Information; (c) failing to take standard and reasonably available steps to prevent the Data Breach; (d) concealing the existence and extent of

the Data Breach for an unreasonable duration of time; and (e) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

152. The actual and adverse effects to Plaintiffs and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft and identity fraud directly or proximately caused by Defendant's wrongful actions and/or inaction and the resulting Data Breach require Plaintiffs and Class Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiffs and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

***Plaintiff Christopher Tillberry's Experience***

153. As a condition of his relationship with Defendant, Plaintiff Tillberry was required to supply Defendant with his Private Information.

154. Upon information and belief, Defendant acquired and maintained Plaintiff Tillberry's Private Information as part of its standard business practices and in connection with the services it provides.

155. Defendant was in possession of Plaintiff Tillberry's Private Information before, during, and after the Data Breach.

156. Plaintiff Tillberry reasonably understood and expected that Defendant would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Tillberry would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement

reasonable and industry-standard practices to safeguard that information from unauthorized access.

157. Plaintiff Tillberry greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Tillberry is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

158. Plaintiff Tillberry stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information, or that may contain any information that could otherwise be used to compromise his identity and credit card accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

159. As a result of the Data Breach, Plaintiff Tillberry has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, and engaging in other necessary mitigation efforts. This is valuable time that Plaintiff Tillberry would have spent on other activities, including but not limited to work and/or recreation.

160. As a consequence of and following the Data Breach, Plaintiff Tillberry has experienced a significant uptick in spam calls, messages, and emails.

161. The Data Breach caused Plaintiff Tillberry to suffer stress and anxiety, which were compounded by Defendant's delay in notifying him that his Private Information had been acquired by criminals as a result of the Data Breach.

162. Plaintiff Tillberry anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Tillberry will continue to be at present and continued increased risk of identity theft and fraud for years to come.

163. Plaintiff Tillberry has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

164. As a direct and traceable result of the Data Breach, Plaintiff Tillberry suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to:

a. lost time and money related to monitoring his accounts and credit reports for fraudulent activity;

b. loss of privacy due to his Private Information being accessed and stolen by cybercriminals;

c. loss of the benefit of the bargain because Defendant did not adequately protect his Private Information;

d. emotional distress because identity thieves now possess his first and last name paired with other sensitive information;

e. imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web;

f. diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Tillberry; and

g. other economic and non-economic harm.

***Plaintiff Taylor Shill's Experience***

165. As a condition of his relationship with Defendant, Plaintiff Shill was required to supply Defendant with his Private Information.

166. Upon information and belief, Defendant acquired and maintained Plaintiff Shill's Private Information as part of its standard business practices and in connection with the services it provides.

167. Defendant was in possession of Plaintiff Shill's Private Information before, during, and after the Data Breach.

168. On May 15, 2026, Defendant sent Plaintiff Shill a letter via U.S. Mail notifying him that his Private Information was contained within the breached files, including his name and Social Security number.

169. Plaintiff Shill reasonably understood and expected that Defendant would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Tillberry would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry-standard practices to safeguard that information from unauthorized access.

170. Plaintiff Shill greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Shill is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

171. Plaintiff Shill stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information, or that may contain any information that could otherwise be used to compromise his identity and credit card accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

172. As a result of the Data Breach, Plaintiff Shill has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, and engaging in other necessary mitigation efforts. This is valuable time that Plaintiff Shill would have spent on other activities, including but not limited to work and/or recreation.

173. As a consequence of and following the Data Breach, Plaintiff Shill has experienced a significant uptick in spam calls, messages, and emails.

174. The Data Breach caused Plaintiff Shill to suffer stress and anxiety, which were compounded by Defendant's delay in notifying him that his Private Information had been acquired by criminals as a result of the Data Breach.

175. Plaintiff Shill anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Shill will continue to be at present and continued increased risk of identity theft and fraud for years to come.

176. Plaintiff Shill has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

177. As a direct and traceable result of the Data Breach, Plaintiff Shill suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to:

a. lost time and money related to monitoring his accounts and credit reports for fraudulent activity;

b. loss of privacy due to his Private Information being accessed and stolen by cybercriminals;

c. loss of the benefit of the bargain because Defendant did not adequately protect his Private Information;

d. emotional distress because identity thieves now possess his first and last name paired with other sensitive information;

e. imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web;

f. diminution in the value of his Private Information, a form of intangible property

that Defendant obtained from Plaintiff Shill; and

g. other economic and non-economic harm.

***Plaintiff Yu Lan's Experience***

178. Plaintiff Lan is a former client of Defendant.

179. As a condition of his relationship with Defendant, Plaintiff Lan was required to supply Defendant with his Private Information.

180. Upon information and belief, Defendant acquired and maintained Plaintiff Lan's Private Information as part of its standard business practices and in connection with the services it provides.

181. Defendant was in possession of Plaintiff Lan's Private Information before, during, and after the Data Breach.

182. Plaintiff Lan reasonably understood and expected that Defendant would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Lan would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry-standard practices to safeguard that information from unauthorized access.

183. Plaintiff Lan greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Lan is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

184. Plaintiff Lan stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information, or that may contain any information that could otherwise be used to compromise his identity and credit card accounts. Moreover, he diligently chooses unique usernames and

passwords for his various online accounts.

185. Following the Data Breach, Plaintiff Lan received several unauthorized password change requests for his accounts with DoorDash, Cash App, Venmo, and Instacart, all of which contain Plaintiff Lan's sensitive financial information.

186. Plaintiff Lan received two unauthorized password change requests for his DoorDash account, including on October 19, 2025, and June 13, 2026.

187. Plaintiff Lan received three unauthorized password change requests for his Cash App account, including on June 7, 2026, June 8, 2026, and June 13, 2026.

188. Plaintiff Lan received four unauthorized password change requests for his Venmo account, including on June 8, 2026, June 9, 2026, June 13, 2026, and June 14, 2026.

189. Plaintiff Lan received one unauthorized password change request for his Instacart account, including on June 13, 2026.

190. As a result of the Data Breach, Plaintiff Lan has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, and engaging in other necessary mitigation efforts. This is valuable time that Plaintiff Lan would have spent on other activities, including but not limited to work and/or recreation.

191. As a consequence of and following the Data Breach, Plaintiff Lan has experienced a significant uptick in spam calls, messages, and emails.

192. The Data Breach caused Plaintiff Lan to suffer stress and anxiety, which were compounded by Defendant's delay in notifying him that his Private Information had been acquired by criminals as a result of the Data Breach.

193. Plaintiff Lan anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Lan will

continue to be at present and continued increased risk of identity theft and fraud for years to come.

194. Plaintiff Lan has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

195. As a direct and traceable result of the Data Breach, Plaintiff Lan suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to:

a. lost time and money related to monitoring his accounts and credit reports for fraudulent activity;

b. loss of privacy due to his Private Information being accessed and stolen by cybercriminals;

c. loss of the benefit of the bargain because Defendant did not adequately protect his Private Information;

d. emotional distress because identity thieves now possess his first and last name paired with other sensitive information;

e. imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web;

f. diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Lan; and

g. other economic and non-economic harm.

## CLASS ALLEGATIONS

196. Plaintiffs bring this class action, individually and on behalf of the following Class:

> All persons in the United States whose Private Information was compromised by the Data Breach.

197. Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons

or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

198. Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

199. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

200. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Although the precise number of such persons is unknown, and the facts are presently within the sole knowledge of Defendant, upon information and belief, Plaintiffs estimate that the Class is comprised of thousands of Class Members, if not more. The Class is sufficiently numerous to warrant certification.

201. Typicality of Claims: Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like the unnamed Class, had their Private Information compromised as a result of the Data Breach. Plaintiffs are members of the Class, and their claims are typical of the claims of the members of the Class. The harms suffered by Plaintiffs are similar to that suffered by all other Class Members which were caused by the same misconduct by Defendant.

202. Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

203. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual

Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

204. Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

a. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c. Whether Defendant's storage of Plaintiffs' and Class Members' Private Information was done in a negligent manner;

d. Whether Defendant had a duty to protect and safeguard Plaintiffs' and Class Members' Private Information;

e. Whether Defendant's conduct was negligent;

f. Whether Defendant's conduct violated Plaintiffs' and Class Members' privacy;

g. Whether Defendant took sufficient steps to secure individuals' Private Information;

h. Whether Defendant was unjustly enriched; and

i. The nature of relief, including damages and equitable relief, to which Plaintiffs and Class Members are entitled.

205. Information concerning Defendant's policies is available from Defendant's records.

206. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

207. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

208. Given that Defendant had not indicated any changes to its conduct or security measures, monetary damages are insufficient, and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

209. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

210. Plaintiffs bring this claim individually and on behalf of the Class Members.

211. Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

212. Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

213. Defendant had, and continues to have, a duty to timely disclose that Plaintiffs' and Class Members' Private Information within its possession was compromised and precisely the types of information that were compromised.

214. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority

like Section 5 of the FTC Act, and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

215. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its employees. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

216. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

217. Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information.

218. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards;

d. Failing to adequately train its employees on proper cybersecurity protocols;

e. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information; and

f. Failing to adequately notify Plaintiffs and Class Members about the Data Breach so they could take appropriate steps to mitigate damages.

219. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendant's possession.

220. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class Members' Private Information.

221. Defendant, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiffs and Class Members that the Private Information within Defendant's possession might have been compromised and precisely the type of information compromised.

222. Defendant breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendant failed to implement proper data security procedures to adequately and reasonably protect Plaintiffs' and Class Members' Private Information. In violation of the FTC guidelines, *inter alia,* Defendant did not protect the Private Information it keeps; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of its networks' vulnerabilities; and failed to implement policies to correct security issues.

223. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable given the known high

frequency of cyberattacks and data breaches.

224. It was foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in injuries to Plaintiffs and Class Members.

225. Defendant's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

226. But for Defendant's negligent conduct and breach of the above-described duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

227. As a result of Defendant's failure to timely notify Plaintiffs and Class Members that their Private Information had been compromised, Plaintiffs and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud. As a result of Defendant's negligence and breach of duties, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiffs and Class Members have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; and overpayment for the services or products that were received without adequate data security.

**COUNT II**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

228. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

229. Plaintiffs and Class Members conferred a benefit upon Defendant by providing Defendant with money in order to receive financial services along with their Private Information.

230. Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiff. Defendant also benefited from the receipt of Plaintiffs' and Class Members' Private Information.

231. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security, that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

232. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and the Class Members' Private Information because Defendant failed to adequately protect their Private Information. Plaintiffs and the proposed Class would not have provided their Private Information to Defendant had they known Defendant would not adequately protect their Private Information.

233. Defendant failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

234. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices alleged.

235. Had Plaintiffs and Class Members known that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

236. Plaintiffs and Class Members have no adequate remedy at law.

237. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

238. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

239. Defendant should be compelled to disgorge into a common fund for the benefit of

Plaintiffs and Class Members all unlawful or inequitable proceeds received by it because of its misconduct and the Data Breach it caused.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

240. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

241. Plaintiffs and the Class provided and entrusted their Private Information to Defendant. Plaintiffs and the Class provided their Private Information to Defendant as part of Defendant's regular business practices.

242. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen, in return for the business services provided by Defendant. Implied in these exchanges was a promise by Defendant to ensure that the Private Information of Plaintiffs and Class Members in its possession was secure.

243. Pursuant to these implied contracts, Plaintiffs and Class Members provided Defendant with their Private Information. In exchange, Defendant agreed to, among other things, and Plaintiffs and the Class understood that Defendant would: (1) provide services to Plaintiffs and Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' Private Information; and (3) protect Plaintiffs' and Class Members' Private Information in compliance with federal and state laws and regulations and industry standards.

244. Implied in these exchanges was a promise by Defendant to ensure the Private Information of Plaintiffs and Class Members in its possession was only used to provide the agreed-

upon reasons, and that Defendant would take adequate measures to protect Plaintiffs' and Class Members' Private Information.

245. A material term of this contract is a covenant by Defendant that it would take reasonable efforts to safeguard that information. Defendant breached this covenant by allowing Plaintiffs' and Class Members' Private Information to be accessed in the Data Breach.

246. Indeed, implicit in the agreement between Defendant and Plaintiffs and Class Members was the obligation that both parties would maintain information confidentially and securely.

247. These exchanges constituted an agreement and meeting of the minds between the parties.

248. When the parties entered into an agreement, mutual assent occurred. Plaintiffs and Class Members would not have disclosed their Private Information to Defendant but for the prospect of utilizing Defendant's services and/or for purposes of employment. Conversely, Defendant presumably would not have taken Plaintiffs' and Class Members' Private Information if it did not intend to provide Plaintiffs and Class Members with its services and/or employment.

249. Defendant was therefore required to reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure and use.

250. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Private Information.

251. Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' Private Information.

252. Defendant's failure to implement adequate measures to protect the Private Information of Plaintiffs and Class Members violated the purpose of the agreement between the parties.

253. As a proximate and direct result of Defendant's breaches of its implied contracts with Plaintiffs and Class Members, Plaintiffs and the Class Members suffered damages as described in detail above.

**COUNT IV**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiffs and the Class)**

254. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

255. At all times during Plaintiffs' and Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' Private Information that Plaintiffs and Class Members entrusted to Defendant.

256. As alleged herein and above, Defendant's relationship with Plaintiffs and the Class was governed by terms and expectations that Plaintiffs' and Class Members' Private Information would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

257. Plaintiffs and Class Members entrusted Defendant with their Private Information with the explicit and implicit understandings that Defendant would protect and not permit the Private Information to be disseminated to any unauthorized third parties.

258. Plaintiffs and the Class also entrusted Defendant with their Private Information with the explicit and implicit understanding that Defendant would take precautions to protect that Private Information from unauthorized disclosure.

259. Defendant voluntarily received Plaintiffs' and Class Members' Private Information

in confidence with the understanding that their Private Information would not be disclosed or disseminated to the public or any unauthorized third parties.

260. As a result of Defendant's failure to prevent and avoid the Data Breach from occurring, Plaintiffs' and Class Members' Private Information was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

261. As a direct and proximate cause of Defendant's actions and omissions, Plaintiffs and the Class have suffered damages.

262. But for Defendant's disclosure of Plaintiffs' and Class Members' Private Information in violation of the parties' understanding of confidence, their Private Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' Private Information as well as the resulting damages.

263. The injury and harm Plaintiffs and the Class suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and Class Members' Private Information. Defendant knew or should have known its methods of accepting and securing Plaintiffs' and Class Members' Private Information was inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiffs' and Class Members' Private Information.

264. As a direct and proximate result of Defendant's breach of confidence with Plaintiffs and the Class, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses

associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of individuals; and (viii) present and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

265. As a direct and proximate result of Defendant's breach of confidence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b) For an order declaring that Defendant's conduct violates the laws referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d) For damages in amounts to be determined by the Court and/or jury;

(e) For an award of statutory damages or penalties to the extent available;

(f) For pre-judgment interest on all amounts awarded;

(g) For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

(h) For an order of restitution and all other forms of monetary relief; and

(i) Such other and further relief as the Court deems necessary and appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Consolidated Class Action Complaint so triable.

Dated: July 1, 2026

Respectfully Submitted,

*/s/ Melissa G. Meyer*

Melissa G. Meyer (5736483)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel.: (212) 363-7500
Email: mmeyer@zlk.com

Courtney Maccarone (5031050)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel.: (954) 525-4100
Email: maccarone@kolawyers.com

Rachel Dapeer, Esq. (4995130)
**DAPEER LAW, PA**
156 W. 56th St., #902
New York, NY 10019
Tel.: (917) 456-9603
Email: rachel@dapeer.com

*Attorneys for Plaintiffs and the Proposed Class*